STATE OF HAWAII, by its Attorney General, Plaintiff-Appellee, *v*. TEXACO, INC., a Delaware corporation, Defendant-Appellant.

No. 5217

June 22, 1972

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE CHANG IN PLACE OF KOBAYASHI, J., DISQUALIFIED

OPINION OF THE COURT BY ABE, J.

The State commenced two separate actions[1] against Texaco, Inc., in the First Circuit Court concerning "Harbor

---

[1]Declaratory Judgment (Civil No. 31192)
Eminent Domain (Civil No. 31961)

Petroleum Lease No. H-68-5." These actions were consolidated for trial.

After a hearing, the trial court found that the State under Paragraph 9, Article IV of the Lease,[2] had the right to terminate the Lease and ordered that the Lease be terminated as of March 31, 1971 and judgment was entered accordingly. Texaco appealed.

The record shows that Texaco began negotiating for a lease of the premises by letter dated September 22, 1966. It shows that Texaco had entered into contract to supply jet fuel to two airlines at the Honolulu International Airport and it was vitally interested in securing berthing facilities for ocean tankers. After considerable negotiation, the State and Texaco came to an agreement on the terms and conditions of the lease. Thereafter a notice for public bid of "Harbor Petroleum Lease" was published in the Honolulu Star-Bulletin (June 7, 10, and 17, 1968). At the public auction held on July 1, 1968, Texaco was the successful bidder.

However, in the meantime, pending the public auction, because of the urgency of having the berthing facilities constructed, Texaco secured a right of entry to proceed with the construction on January 26, 1968. The Right of Entry Agreement provided for its termination upon the execution of a lease, and also provided that in the event Texaco was not the successful bidder, it would, at the option of the successful bidder, restore the premises to its original condi-

---

[2]Paragraph 9, Article IV of the Lease reads:

"9. *Relocation*. In the event the berthing facilities at the demised premises are required by the STATE for other purposes, necessitating an extension of LESSEE's pipelines, LESSEE shall surrender the demised premises and the LESSOR shall substitute like berthing facilities for the use of LESSEE and grant any necessary extension of the pipeline easement on a non-exclusive basis. Any extension of the pipelines shall be at the sole cost and expense of the LESSEE if such extension is not required to be done until five (5) years or more have elapsed under this Lease. If five (5) years have not elapsed, the LESSOR shall pay the cost of extending the pipelines of the LESSEE to the substitute berthing facilities. In either event LESSOR shall provide easements for LESSEE to extend and maintain its pipelines from the demised premises to the substitute berthing facilities, and from and after the time LESSEE surrenders the demised premises, it shall have no obligation to pay rental and fees hereunder."

tion.

The basic issue is whether the State has the right to terminate the Lease under the provisions of Paragraph 9, Article IV.

Texaco contends: (1) that the State may terminate the Lease to put the demised premises to use other than that of wharfing or berthing facilities under the clause "for other purposes"; and (2) that the State under Paragraph E(4)(c), Article III[3] of the Lease, with approval of Texaco (which approval was granted), could make the proposed improvement to the docking facilities and put the facilities to "the intended use," and that the State should be required to proceed under this particular paragraph.

One of the statutory requirements in the execution of a lease of public lands by the State is that the demise of the premises must be for a "specific use or uses to which the land is to be employed." HRS § 171-35; see also § 171-36.

Also, HRS § 171-16 requires that in the disposition of lease of public lands by public auction, the notice among other requirements must state the specific use for which the premises to be demised may be put. These provisions of the Statute are applicable to this lease under HRS § 171-11[4] though it was not executed by the Chairman of the Board

---

[3]Paragraph E(4)(c), Article III of the Lease reads:

"(c) LESSOR may enter upon the demised premises at all reasonable times to make such additions, alterations, replacements and repairs as may, in the opinion of the LESSOR, be necessary or desirable and from time to time, construct or install within the demised premises, structures, equipment and improvements for other uses of the demised premises at LESSOR's sole expense, provided, however, (i) LESSOR's exercise of the rights reserved herein shall not in any way hinder, diminish or affect the preferential use of the demised premises by the LESSEE to use and occupy the same as set forth in (3), above, and (ii) LESSOR will not undertake to exercise any such rights without the prior written consent of the LESSEE, which consent shall not be unreasonably withheld."

[4]The pertinent provisions of § 171-11 reads:

"The governor may, with the prior approval of the board of land and natural

of Land and Natural Resources but by the Director of Transportation for the State with the approval of the Board of Land and Natural Resources.

Pursuant to HRS § 171-16, "Notice of Public Auction" was duly published in the Honolulu Star-Bulletin. The notice provided that "[t]he demised premises shall be used only to discharge and load petroleum and other related products, and in connection therewith, to perform services and carry on business incidental thereto."

The Lease gives the Lessee "[t]he right to conduct its petroleum business on the demised premises and in connection therewith the right to dock, use, transport, deliver, distribute, market, and sell petroleum products and other related products and to perform services incidental thereto."

Under the terms of the Notice and the Lease it is clear that the premises were demised to the Lessee for the sole purpose of discharging and loading petroleum products (or other related products) and in connection with said activity to "perform services and carry on business incidental thereto."

As we have said:

"The statutory provisions of Hawaii forbid any agreement between the State and a prospective bidder for a lease of State land inconsistent with the terms of the notice of sale as published. Any such agreement contrary to the terms of the published notice of sale would be illegal and unenforceable. Otherwise, the statutory

---

resources, set aside public lands to any department or agency of the State, the city and county, county, or other political subdivisions of the State for public use or purpose. . . .

. . . . Such department, agency of the State, the city and county, county, or other political subdivisions of the State in managing such lands shall be authorized to exercise all of the powers vested in the board in regard to the issuance of leases, easements, licenses, revocable permits, concessions, or rights of entry covering such lands for such use as may be consistent with the purposes for which the lands were set aside on the same terms, conditions, and restrictions applicable to the disposition of public lands, all such dispositions being subject to the prior approval of the board."

requirements become meaningless. They were 'enacted to prevent improvident bargains and corruption.' *Fasi v. Land Commissioner, supra,* 41 Haw. 461, 475. Where there has been strict compliance with the statutory requirements the sale is conclusive on all parties. *Cf., Munoz v. Commissioner of Public Lands,* 40 Haw. 675, 689."

*State v. Kahua Ranch,* 47 Haw. 28, 36, 384 P.2d 581 (1963).

Paragraph 9, Article IV of the Lease provides that the State may require the Lessee to surrender the demised premises when the premises are required by the State to be put to "other purposes." The question here is what is meant by "other purposes." The logical and most reasonable interpretation to be placed is to require the Lessee to surrender the premises when the premises are required by the State to be put to use other than for the sole purpose of discharging or loading petroleum and other related products. In other words, other purposes must be interpreted to mean other than the use for which the premises have been leased. We cannot agree with the Lessee that the term "for other purposes" used in the Lease means purpose other than the operation of wharfing or berthing facilities. On this point, it should be noted that the premises in question and the area along the waterfront had been set aside by the Governor pursuant to law to the Department of Transportation for its activities of operating the Honolulu Harbor complex.

The State's plan is to convert the demised premises to a facility which "will be designed to accommodate all types of cargo including general cargo, sand and aggregates, lumber, as well as containers." Thus, it is putting the premises to purposes other than for which the premises were demised, and the State may terminate the lease as provided in Paragraph 9, Article IV of the Lease.

It is correct that the State could have entered into the premises under the provisions of Paragraph E(4)(c),. Article III; however, the State chose to act under Paragraph 9,

Article IV. This was an exercise of an option reserved to the State, and Texaco is in no position to compel the State to act otherwise.

Affirmed.

*James M. Sattler (Jenks, Kidwell, Goodsill & Anderson* of counsel) for defendant-appellant.

*Arthur Murakami (Richard Y. C. Au,* Deputy Attorney General, and *George Pai,* Attorney General, on the brief) for plaintiff-appellee.